UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

CARLOS M. OLIVEIRA,                    :
        Plaintiff,                     :
                                       :
        v.                             :      CA 99-522 ML
                                       :
JO ANNE B. BARNHART,                   :
Commissioner, Social Security          :
Administration,                        :
        Defendant.                     :

## REPORT AND RECOMMENDATION

This matter is before the Court for judicial review of a
final decision of the Commissioner of the Social Security
Administration ("Commissioner" or "Defendant") denying
Supplemental Security Income ("SSI") and Disability Insurance
Benefits ("DIB") under the Social Security Act ("Act"), 42 U.S.C.
§ 405(g).  On August 18, 2005, the Commissioner filed a motion
for an order affirming her decision.  See Defendant's Motion for
Order Affirming the Decision of the Commissioner (Document
("Doc.") #9) ("Motion to Affirm").  Thereafter, the matter was
referred to me for preliminary review, findings and recommended
disposition.  See 28 U.S.C. § 636(b)(1)(B); see also Order of
8/19/05 (Doc. #10).

After reviewing the entire record, reading the submissions
of the parties, and performing independent legal research, I find
that there is substantial evidence in the record to support the
Commissioner's decision and finding that Plaintiff is not
disabled within the meaning of the Act.  Consequently, I
recommend that Defendant's Motion to Affirm be granted.

## I.   Procedural History

Plaintiff filed an application for SSI and DIB in February
1996, alleging disability since June 1, 1991.  (Record ("R.") at
15, 68, 216-17)  The application was denied initially (R. at 220-

23) and on reconsideration (R. at 225-29).  Plaintiff requested a hearing before an administrative law judge ("ALJ"), and the hearing was held on March 7, 1997.  (R. at 67)  In a written decision issued on December 3, 1997, the ALJ denied Plaintiff's application, finding he remained able to perform a full range of unskilled light jobs in the national economy.  (R. at 67-74) Plaintiff sought review of this decision by the Appeals Council, but it denied his request on or about September 22, 1999.  (R. at 127-28)

Acting pro se, Plaintiff filed a complaint in this Court on October 15, 1999, seeking judicial review of the decision of the Commissioner.  See Complaint (Doc. #1).  On April 3, 2000, the Commissioner filed a motion to remand the matter to the Commissioner for further proceedings pursuant to sentence six of 42 U.S.C. § 405(g) because the claim file could not be located. See Motion to Remand (Doc. #4) at 1.

On July 16, 2003, a hearing was held before a second ALJ at which Plaintiff, a vocational expert ("VE"), and a medical expert ("ME") testified.  (R. at 25-63)  Plaintiff was represented at the hearing by counsel.  (R. at 25, 27)  The ALJ issued a decision on September 11, 2003, finding that Plaintiff could perform a significant number of unskilled light jobs and, therefore, was not disabled within the meaning of the Act.  (R. at 15-22)  The Appeals Council denied Plaintiff's request for review on May 19, 2004, (R. at 7-8), rendering the ALJ's decision the final decision of the Commissioner, subject to judicial review.

On August 18, 2005, the Motion to Affirm was filed.  See Docket.  The Court scheduled a hearing on this motion for September 7, 2005, but Plaintiff failed to appear for the hearing.  See id.  Counsel for the Commissioner advised the Court that Plaintiff had filed another action on May 25, 2004, seeking

review of the same decision which was the subject of the instant Motion to Affirm. See Tape of 9/7/05 Hearing; see also Oliveira v. Barnhart, CA 04-207 L. Plaintiff's application to proceed in forma pauperis in that action was denied by Senior Judge Ronald R. Lagueux on June 3, 2004, and the case was dismissed without prejudice on July 12, 2004. See id. Counsel for the Commissioner opined that because of this dismissal Plaintiff may have been confused as to the purpose of the September 7, 2005, hearing on the Motion to Affirm. See Tape of 9/7/05 Hearing. The Court agreed that this was a possibility and also noted that the record contained two different addresses for Plaintiff. See id. Accordingly, the Court rescheduled the hearing on the Motion to Affirm to September 28, 2005, and directed that notice be sent to Plaintiff at both addresses appearing in the record. See id.

Plaintiff appeared pro se at the hearing on September 28, 2005. See Docket. The Court explained to him that as a result of the Commissioner filing the Motion to Affirm Plaintiff had another opportunity to obtain judicial review of the ALJ's decision dated September 11, 2003. See Tape of 9/28/05 Hearing. Because Plaintiff indicated that he wished to obtain counsel, the Court continued the matter to October 28, 2005. See id. Plaintiff was advised that if an attorney had entered his or her appearance in the action by that date Plaintiff would not have to appear on October 28, 2005, but if no attorney had entered Plaintiff had to be present for the hearing. See id.

On October 28, 2005, Plaintiff appeared and advised the Court that he had been unable to find an attorney. See Tape of 10/28/05 Hearing. The Court, in order to provide Plaintiff with a final opportunity to obtain counsel, continued the matter to January 3, 2006, for determination of attorney. See Scheduling Order (Doc. #13). Plaintiff was advised by the Court both orally and in writing that if he did not obtain counsel by January 3,

-3-

2006, he must appear for the scheduled hearing and inform the Court of this fact. See Tape of 10/28/05 Hearing; Scheduling Order. The Court also set February 17, 2006, as the date by which Plaintiff, either represented by counsel or acting pro se, must file a response to the Motion to Affirm. See id. The Court took this additional step so that Plaintiff would be able to advise the attorneys whom he consulted of the amount of time they would have to file a response if they entered their appearance in the action. See id.

Plaintiff appeared for the hearing on January 3, 2006, and reported that he had not been able to find an attorney to represent him. See Tape of 1/3/06 Hearing. The Court responded that in accordance with the Scheduling Order issued on October 28, 2005, Plaintiff would have until February 17, 2006, to file a response to the Motion to Affirm. See id. Plaintiff was further advised that if no response were received by that date, the Court would decide the Motion to Affirm without it. See id.

Plaintiff's pro se response was filed on February 9, 2006. See Plaintiff's Response to Defendant[']s Motion (Doc. #14) ("Plaintiff's Response"). Thereafter, the Court took the matter under advisement.

## II. The Parties' Positions

In deference to Plaintiff's pro se status, the Court views his response to the Motion to Affirm liberally. So viewed, Plaintiff argues that the ALJ's decision was not based on substantial evidence because: 1) Plaintiff's medical records were not complete and, therefore, the ALJ did not fully review the record; 2) the ME testified to matters outside of his area of medical expertise and he had not examined Plaintiff or reviewed Plaintiff's MRI reports; and 3) the VE testified that Plaintiff would not be able to perform the available jobs if Plaintiff frequently needed to lie down and rest and Plaintiff had

testified that this was in fact the case.  See Plaintiff's
Response.  Defendant maintains that the Commissioner's findings
are supported by substantial evidence in the record.

## III. The Standard of Review

The Commissioner's findings of fact are conclusive if
supported by substantial evidence.  42 U.S.C. § 405(g); Irlanda
Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st
Cir. 1991); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d
218, 222 (1st Cir. 1981).  "Substantial evidence is more than a
scintilla, and must do more than create a suspicion of the
existence of the fact to be established.  It means such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion."  BSP Trans, Inc. v. U.S. Dep't of Labor, 160 F.3d
38, 47 (1st Cir. 1998); see also Rodriguez v. Sec'y of Health &
Human Servs., 647 F.2d at 222; Currier v. Sec'y of Health, Educ.
& Welfare, 612 F.2d 594, 597 (1st Cir. 1980).

Where the Commissioner's decision is supported by
substantial evidence, the court must affirm, even if the court
would have reached a contrary result as finder of fact.
Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144
(1st Cir. 1987); Rodriguez Pagan v. Sec'y of Health & Human
Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v.
Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991)("Even if we find
that the evidence preponderates against the [Commissioner's]
decision, we must affirm if the decision is supported by
substantial evidence.").  The court must view the evidence as a
whole, taking into account evidence favorable as well as
unfavorable to the decision.  Parker v. Bowen, 793 F.2d 1177,
1180 (11th Cir. 1986)(stating that court "must view the entire
record and take account of evidence in the record which detracts
from the evidence relied on by the [Commissioner]")(internal
quotation marks omitted)(alteration in original); see also Becker

v. Sec'y of Health & Human Servs., 895 F.2d 34, 37 (1st Cir. 1990)(noting existence of contrary evidence in the record).

While the ALJ's findings of fact are conclusive when supported by substantial evidence, they are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999); see also Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991)(holding that failure to apply the correct law or to provide reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal). If the evidence and the law compel a decision to either award or deny benefits, then the Court may order such award or denial. Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001). However, "ordinarily the court can order the agency to provide the relief it denied only in the unusual case in which the underlying facts and law are such that the agency has no discretion to act in any manner other than to award or deny benefits." Id.

The court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g), under sentence six of 42 U.S.C. § 405(g), or under both sentences. Seavey v. Barnhart, 276 F.3d at 8.

> The fourth sentence ... states that a reviewing court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The sixth sentence states that the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." Id.

Seavey v. Barnhart, 276 F.3d at 8-9. "Sentence six and its 'good

cause' limitation come into play only 'when the district court
learns of evidence not in existence or available to the applicant
at the time of the administrative proceeding that might have
changed the outcome of that proceeding.'"   Seavey v. Barnhart,
276 F.3d at 13 (quoting Sullivan v. Finklestein, 496 U.S. 617,
626, 110 S.Ct. 2658 (1990)).   Sentence six has been referred to
as a "pre-judgment remand," employed where the federal court has
not ruled on the validity of the Commissioner's position, while
sentence four has been referred to as a "post-judgment remand."
Id. (citing Faucher v. Sec'y of Health & Human Servs., 17 F.3d
171, 175 (6th Cir. 1994)).   Unlike sentence six, sentence four
does not contain any statutory limits on the ability to
supplement the record on remand, although the First Circuit has
left open the "possibility of some constraints in unusual cases."
Id.

**IV.   The Law**

The law defines disability as the inability to do any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected
to result in death or which has lasted or can be expected to last
for a continuous period of not less than twelve months.   42
U.S.C. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 404.1505 (2006).
The impairment must be severe, making the claimant unable to do
his previous work or any other substantial gainful activity which
exists in the national economy.   42 U.S.C. § 423(d)(2); 20 C.F.R.
§§ 404.1505(a) (2006).

**A.   Developing the Record**

The ALJ has a duty to develop an adequate record from which
a reasonable conclusion can be drawn.   Heggarty v. Sullivan, 947
F.2d 990, 997 (1st Cir. 1991); Evangelista v. Sec'y of Health &
Human Servs., 826 F.2d 136, 142 (1st Cir. 1987)("[The
Commissioner] bear[s] a responsibility for adequate development

of the record in these cases."). The responsibility to develop
the record increases when the applicant is unrepresented by
counsel. Id.; Currier v. Sec'y of Health, Educ. & Welfare, 612
F.2d 594, 598 (1st Cir. 1980); see also Heggarty, 947 F.2d at 997
(stating that although claimant waived right to be represented by
counsel at the hearing, the ALJ had duty to develop record more
fully).

**B.   The Five-step Evaluation**

The Social Security regulations prescribe a five-step
inquiry for use in determining whether a claimant is disabled.[1]
See 20 C.F.R. § 404.1520(a) (2006); see also Bowen v. Yuckert,
482 U.S. 137, 140-42, 107 S.Ct. 2287, 2291 (1987); Seavey v.
Barnhart, 276 F.3d 1, 5 (1st Cir. 2001). Pursuant to that
scheme, the Secretary must determine sequentially: (1) whether
the claimant is presently engaged in substantial gainful work
activity; (2) whether he has a severe impairment; (3) whether his
impairment meets or equals one of the Commissioner's listed
impairments; (4) whether the claimant is able to perform his past
relevant work; and (5) whether the claimant remains capable of
performing any work within the economy. See 20 C.F.R. §
404.1520(b)-(g). The evaluation may be terminated at any step.
See Seavey, 276 F.3d at 5. "The applicant has the burden of
production and proof at the first four steps of the process. If

_____

[1] The Commissioner has promulgated identical regulations for
determining eligibility for Disability Insurance Benefits ("DIB") and
Supplemental Security Income ("SSI"). See 20 C.F.R. § 404.1520(a)
(2006)(listing steps for determining eligibility for DIB); 20 C.F.R. §
416.920(a) (2006)(listing steps for determining eligibility for SSI);
see also McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118,
1120 n.1 (1st Cir. 1986)(noting that for purposes of definition of
disability, sequential evaluation, and severity requirement, statutory
and regulatory schemes for DIB and SSI are identical). Thus, the five
step process applies to both DIB and SSI claims. Wells v. Barnhart,
267 F. Supp.2d 138, 144 (D. Mass. 2003). For convenience, the court
generally will cite to only one set of regulations. See McDonald, 795
F.2d at 1120 n.1.

the applicant has met his or her burden at the first four steps, the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform." Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the Commissioner must consider the combined effect of all of the claimant's impairments and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant bears the ultimate burden of proving the existence of a disability as defined by the Social Security Act. Seavey v. Barnhart, 276 F.3d at 5. The claimant must demonstrate disability on or before the last day of his insured status for the purposes of disability benefits. See Parsons v. Heckler, 739 F.2d 1334, 1336 n.2 (8th Cir. 1984); see also 42 U.S.C. §§ 416(i)(3), 423(a), (c). If a claimant becomes disabled after he has lost insured status, his claim for disability benefits must be denied despite his disability. Id.

Once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. Seavey v. Barnhart, 276 F.3d at 5. In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through use of a chart contained in the Social Security regulations ("the

Grid"). <u>Seavey v. Barnhart</u>, 276 F.3d at 5.  If the applicant's
limitations are exclusively exertional, then the Commissioner can
meet her burden by using the Grid.  <u>Id.</u>  However, if the
applicant has nonexertional limitations (such as mental, sensory,
or skin impairments or environmental restrictions such as an
inability to tolerate dust) that restrict his ability to perform
jobs he would otherwise be capable of performing, then the Grid
is only a "framework to guide [the] decision." <u>Id.</u> (alteration
in original); <u>see also</u> <u>Nguyen v. Chater</u>, 172 F.3d 31, 36 (1st
Cir. 1999)(finding application of Grid by ALJ erroneous where
record did not support that claimant was capable of performing
the full range of sedentary work without any significant
impairments).  In almost all of such cases, the Commissioner's
burden can be met only through the use of a vocational expert.
<u>See</u> <u>Heggarty v. Sullivan</u>, 947 F.2d at 996-97; <u>see also</u> <u>Pearsall
v. Massanari</u>, 274 F.3d 1211, 1219 (8th Cir. 2001); <u>Day v.
Heckler</u>, 781 F.2d 663, 665 (8th Cir. 1986).

    **C.   Pain**

"Pain can constitute a significant non-exertional impairment
...." <u>Nguyen v. Chater</u>, 172 F.3d at 36.  Congress has determined
that a claimant will not be considered disabled unless he
furnishes medical and other evidence (e.g., medical signs and
laboratory findings) showing the existence of a medical
impairment which could reasonably be expected to produce the pain
or symptoms alleged. 42 U.S.C. § 423(d)(5)(A).  The ALJ must
consider all of a claimant's statements about his symptoms,
including pain, and determine the extent to which the symptoms
can reasonably be accepted as consistent with the objective
medical evidence. 20 C.F.R. § 404.1529(a) (2006).  In
determining whether the medical signs and laboratory findings
show medical impairments which reasonably could be expected to
produce the pain alleged, the ALJ must apply the six-part pain

analysis articulated by the First Circuit in <u>Avery v. Sec'y of
Health & Human Servs.</u>, 797 F.2d 19 (1st Cir. 1986), and consider
the following factors:

> (1)  The nature, location, onset, duration,
> frequency, radiation, and intensity of
> any pain;
>
> (2)  Precipitating and aggravating factors
> (e.g., movement, activity, environmental
> conditions);
>
> (3)  Type, dosage, effectiveness, and adverse
> side-effects of any pain medication;
>
> (4)  Treatment, other than medication, for
> relief of pain;
>
> (5)  Functional restrictions; and
>
> (6)  The claimant's daily activities.

<u>Id.</u> at 29; <u>see also</u> 20 C.F.R. § 404.1529 (2006).  An individual's
statement as to pain is not, by itself, conclusive of disability.
42 U.S.C. § 423(d)(5)(A).

### D.  Credibility

Where an ALJ decides not to credit a claimant's testimony
about pain, this determination must be supported by substantial
evidence and "the ALJ must make specific findings as to the
relevant evidence he considered in determining to disbelieve the
appellant."  <u>DaRosa v. Sec'y of Health & Human Servs.</u>, 803 F.2d
24, 26 (1st Cir. 1986).  "The credibility determination by the
ALJ, who observed the claimant, evaluated his demeanor, and
considered how that testimony fit in with the rest of the
evidence, is entitled to deference, especially when supported by
specific findings."  <u>Frustaglia v. Sec'y of Health & Human
Servs.</u>, 829 F.2d 192, 195 (1st Cir. 1987).

A lack of a sufficiently explicit credibility finding
becomes a ground for remand when credibility is critical to the

outcome of the case.   See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).   If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995)(quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

## V.   Facts

Plaintiff was thirty-eight years old when his insured status expired (late June 1994) and forty-seven years old at the time the ALJ issued her decision in September 2003.   (R. at 21, 216) Plaintiff has previously worked as a shipper at a warehouse and as a building contractor.   (R. at 59-60, 68, 89)   He testified that he last worked on a sustained basis in 1991 and that he had been laid off because the company went out of business.[2]   (R. at 32)

On January 28, 1986, Plaintiff injured his back at work lifting a die weighing one hundred pounds.   (R. at 83)   He underwent a lumbar laminectomy on February 18, 1987.   (R. at 89) Plaintiff recovered well from the surgery and returned to work. (Id.)   In early 1993, he fell down a flight of stairs and re-injured his back.   (Id.)   An examination by Dr. Paul W. Bernstein on May 26, 1993, revealed no clinical signs of a ruptured disc, but Plaintiff reported continued low back pain.   (R. at 90)   An MRI performed on August 19, 1993, showed post-operative scarring from the prior surgery at L5-S1 on the left "and suggestion of a

---

[2]Although Plaintiff testified at the July 16, 2003, hearing that he had last worked in 1991, (R. at 32), Dr. Paul M. Bernstein recorded in an April 13, 1993, office note that Plaintiff "has been gainfully employed as a contractor and functioning well until helping his brother at his brother's home, he fell down a flight of stairs and hurt his lower back," (R. at 89).

small left posterolateral disc herniation." (R. at 92) The report also noted "posterior vertebral body spurring and some foraminal encroachment at L5-S1 slightly greater on the left." (Id.) On November 2, 1993, Plaintiff complained to Dr. Bernstein of stiffness in his back and down his left leg. (R. at 93) Dr. Bernstein's treatment plan called for Plaintiff to "continue on his conservative management," (id.), and that he should "pursue his exercises ag[g]ressively and progress them as able," (id.). Plaintiff was give a prescription for Soma. (Id.) Dr. Bernstein noted that Plaintiff remained disabled from work. (Id.) Following an examination on November 30, 1993, Dr. Bernstein noted that Plaintiff continued to be disabled from his "normal form of work or any form of work that involves lumbar stress." (R. at 94)

Plaintiff's low back pain persisted. (R. at 95) On February 8, 1994, he told Dr. Bernstein that when he bent over to wash his face or to play pool the pain increased. (Id.) Plaintiff reported on April 5, 1994, that he had awoken the day before with much more pain than previously and that subsequently, after standing for two hours later in the day at the auto registration bureau, he had experienced significant low back pain and left lower extremity pain. (R. at 96) On examination Plaintiff showed significant restriction in range of motion in the lumbar region with associated paralumbar tenderness and some quadriceps weakness and an absent left knee jerk reflex. (Id.) Dr. Bernstein recommended that Plaintiff exercise his leg by walking and bicycling. (Id.)

Plaintiff reported a slight improvement on August 23, 1994, and related that he was not taking his prescription pain reliever but was using Tylenol as needed. (R. at 98) Dr. Bernstein noted that Plaintiff's lumbar range of motion was adequate and that his knee jerk reflex was now present but decreased. (R. at 98) On

-13-

October 18, 1994, Plaintiff complained of moderate lumbar pain, especially when he increased his activity level. (R. at 99) However, in April of 1995, Plaintiff told Dr. Bernstein that he was relatively asymptomatic and that he felt the best he had in a long time. (R. at 100) Plaintiff had lost sixteen pounds since September when he weighed 238 pounds. (Id.) Findings on examination were normal, except for bilaterally decreased knee jerk reflexes. (Id.) Plaintiff planned to look for work, but was cautioned against excessive, heavy lifting. (Id.)

Plaintiff reinjured his back while picking up a console television at his new warehouse job on November 1, 1995. (R. at 101) Eight days later, Dr. Bernstein diagnosed an acute lumbar strain with an underlying disc problem. (Id.) Plaintiff continued to complain of low back stiffness in January of 1996, but acknowledged he was "perhaps a little bit better ...." (R. at 102) On March 7, 1996, Plaintiff reported he had recently developed some right leg and foot pain. (R. at 103) Dr. Bernstein found that his lumbar motion was moderately restricted and he showed some paralumbar spasm and mild tenderness. (Id.) During the remainder of 1996, Plaintiff's condition remained largely unchanged. (R. at 104-07)

On January 17, 1997, Dr. Bernstein noted that Plaintiff showed significant restriction of lumbar motion. (R. at 108) While Plaintiff had only mild tenderness to palpation, he had considerable paralumbar spasm. (Id.) Straight leg raising was positive bilaterally at seventy-five degrees, without any clear sign of focal neuropathy. (Id.) In April of 1997, Dr. Bernstein reported that there had been no significant change in Plaintiff's condition from January 17th. (R. at 109) Plaintiff told Dr. Bernstein in July of 1997 that he seemed to do better in warmer weather, although his weight had increased to 250 and he was not

-14-

exercising very much.[3]   (R. at 110)   Dr. Bernstein encouraged
Plaintiff to exercise regularly, including swimming.   (Id.)   On
September 13, 1997, Dr. Bernstein filled out a physical capacity
evaluation form, indicating that Plaintiff could not even do
sedentary work on a full-time basis.   (R. at 111)

Plaintiff told a doctor at the Memorial Hospital of Rhode
Island ("Memorial Hospital") on January 29, 1998, that his
condition had remained about the same for the past couple of
years.   (R. at 116)   He was not using either prescription or
over-the-counter medications for pain, but was using a heating
pad.   (Id.)   On examination, Plaintiff showed some mild point
tenderness over his vertebrae, but no sign of paraspinal
tenderness or spasm.   (Id.)   Spinal flexion and extension were
limited.   (Id.)   Plaintiff was seen again at Memorial Hospital
later that year.   (R. at 120)   At that time, Plaintiff said his
low back pain had been reasonably well-controlled by Motrin, but
that he had recently begun to have mid back pain radiating into
his arms and hands.   (Id.)   On examination, he showed some spinal
stiffness but no significant point tenderness.   (Id.)   Plaintiff
was encouraged to undergo physical therapy.   (Id.)   He requested
that a disability form be filled out for him "for car insurance,"
(id.), and this was done, (R. at 121).

In May of 1998 it was noted that a recent MRI showed central
disc herniation at L5/S1 with mild narrowing of the central
canal.   (R. at 121)   On examination, Plaintiff exhibited mild
thoracic tenderness but no lumbar tenderness.   (R. at 121-22)
Sensory findings were normal, but muscle strength was slightly

---

[3] In 1997, Plaintiff was seen by Louis A. Fuchs, M.D., for a
consultative examination.   (R. at 213-14)   At this time, Plaintiff
exhibited significant limited back motion and subnormal muscle
strength (3+/5).   (Id.)   Dr. Fuchs felt Plaintiff could do the lifting
associated with light work, but was limited in his ability to stand
and walk and to bend and squat.   (R. at 215); see also 20 C.F.R. §
404.1567(b).

decreased (4+/5), and there was some limitation of trunk flexion.
(R. at 122)   It was noted that Plaintiff had not followed through
on the referral to physical therapy.  (R. at 121)   On July 9,
1998, Plaintiff mentioned that his symptoms had remained
unchanged, yet he still had not followed through on the
recommended physical therapy.  (R. at 123)

        Later that year, it was noted in a Memorial Hospital report
that Samuel H. Greenblatt, M.D., a neurologist, had recommended a
laminectomy or cortisone injections and that Plaintiff was
thinking about this but had concerns about either option.  (R. at
124)   Plaintiff said he had not gone to physical therapy because
Dr. Greenblatt had told him it would not help his condition.
(Id.)   On examination, Plaintiff displayed lumbosacral tenderness
and the absence of patellar reflexes, but sensory findings were
normal.   (Id.)

        In January 1999, Plaintiff returned to Memorial Hospital and
indicated that he had now had insurance and was interested again
in follow-up care.  (R. at 125)   He was unwilling to lie down for
examination due to his complaints of back pain and he showed
minimal ability to walk on his heels or toes, but sensation in
his legs was normal.   (Id.)   Plaintiff was again referred to
physical therapy, and another disability form was completed.
(Id.)

        Regarding Plaintiff's diabetes, while an earlier report from
the Rehoboth-Seekonk Medical Center indicated that Plaintiff's
diabetes was well-controlled, (R. at 182), notes from that
facility made in April of 1999 indicate that Plaintiff had quit
taking his medications for diabetes control, (R. at 189), and
that his diabetes and hypertension were uncontrolled at that
time, (R. at 190).  On June 30, 1999, Plaintiff complained of
recent "palpitations," (R. at 193), but it was noted that his
diabetes and hypertension were now under good control, (R. at

194).  It was noted that Plaintiff lived a sedentary lifestyle, (R. at 193), that he was "not interested in an exercise program," (id.), and that he was currently taking no medications for back pain, (id.).  While his low back pain was intermittent, Plaintiff said that he had constant low back stiffness.  (Id.)  Examination disclosed some sensory changes in Plaintiff's feet.  (R. at 194)

On October 5, 1999, Plaintiff was seen for complaints of neck stiffness after his car was rear-ended.  (R. at 195)  It appears from the record that Plaintiff did not return to the Rehoboth-Seekonk Medical Center until October 9, 2001, when he complained of left ear pain.  (R. at 198)  The review of symptoms at that time did not indicate any current musculoskeletal or neurological complaints.  (Id.)

On February 26, 2002, Omer Meer, M.D., completed a patient history form, stating that Plaintiff was disabled due to back problems.  (R. at 204)  Dr. Meer noted that Plaintiff was not taking any medication for his diabetes.  (Id.)  From December of 2002 to February of 2003, Plaintiff was seen on a monthly basis at Dr. Meer's office for routine monitoring of his high blood pressure.  (R. at 205, 207-08)  During the February 11, 2003, visit Plaintiff reported chronic back pain, but his blood pressure had improved.  (R. at 208)  Plaintiff was referred to "Dr. Saris" for back pain.  (Id.)

## VI.  Errors Claimed

### A.  Development of the Record

Plaintiff appears to contend that the ALJ did not adequately develop the record.  He states: "I[4] believe that my medical records aren't fully complete in determining the full status of

---

[4] In his Response to Defendant['s] Motion ("Plaintiff's Response"), Plaintiff in some instances uses nonstandard capitalization and spelling.  In quoting such portions of Plaintiff's Response, the Court has changed the capitalization and spelling to standard usage.  For ease of comprehension, the changes have been made without signal.

my claim in which the Administrative Law Judge had decided upon without full review." Plaintiff's Response. Plaintiff does not explain in what respect his medical records were incomplete or identify any missing records.

Because Social Security proceedings are not adversarial in nature, the ALJ has a duty to develop an adequate record from which a reasonable conclusion can be drawn. Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991).

> [T]his responsibility increases in cases where the appellant is unrepresented, where the claim itself seems on its face to be substantial, where there are gaps in the evidence necessary to a reasoned evaluation of the claim, and where it is within the power of the administrative law judge, without undue effort, to see that the gaps are somewhat filled--as by ordering easily obtained further or more complete reports or requesting further assistance from a social worker or psychiatrist or key witness.

Id. (citing Currier v. Sec'y of Health, Educ. & Welfare, 612 F.2d 594, 598 (1st Cir. 1980)); see also Rice v. Chater, No. 95-179-JD, 1996 WL 360240, at *10 (D.N.H. Apr. 23, 1996)(noting that the "basic obligation to develop a full and fair record rises to a special duty when an unrepresented claimant unfamiliar with hearing procedures appea[r]s before him")(quoting Lashley v. Sec'y of Health & Human Servs., 708 F.2d 1048, 1051 (6th Cir. 1983)(quotation marks and citations omitted)). However, the First Circuit has emphasized "that we do not see such responsibilities arising in run of the mill cases," Currier v. Sec'y of Health, Educ. & Welfare, 612 F.2d at 598, and has indicated that there must be some "special circumstances," id., such as a claimant who is "obviously mentally impaired to some degree ...," id., to trigger it. In the instant matter, Plaintiff was represented by counsel at the hearing before the ALJ. (R. at 25, 27) Thus, the increased responsibility to

develop the record which may exist in special circumstances is clearly inapplicable.  See Heggarty v.Sullivan, 947 F.2d at 997.

Prior to the hearing, Plaintiff's counsel sent a letter on March 28, 2003, to the Social Security Administration Office of Hearings and Appeals in Providence, Rhode Island, stating that he was:

> sending you a complete copy of every medical record I
> have.  There are no other medical records to submit.
> These records are complete with regard to my client'[s]
> treatment.

(R. at 24)

At the outset of the hearing, the ALJ and Plaintiff's counsel discussed the state of the record.  (R. at 28)  The ALJ asked Plaintiff's counsel if he believed that she had the entire file, and he answered affirmatively.  (Id.)  Later in the hearing, immediately after Plaintiff testified that he could not recall whether he had received physical therapy, the ALJ asked Plaintiff's counsel: "Do we have any records of physical therapy?"  (R. at 37)  Counsel responded: "No."  (Id.)

Still later in the hearing, after Plaintiff expressed uncertainty as to whether he had received treatment for his back at the Veterans Administration Medical Center ("VA"), (R. at 49), the ALJ inquired of Plaintiff's counsel whether he had reason to believe that Plaintiff had been treated at the VA for his back, (R. at 50).  Plaintiff's counsel replied that he had "never requested any medical records from the VA [Medical Center] ... so I don't, I just don't know ...."  (Id.)  Plaintiff then stated that he was "pretty sure there is some kind of record," id., whereupon the ALJ announced that she was going to hold the record open for two weeks for those records, see id.  Shortly thereafter Plaintiff testified that he had reported swelling of his feet to "a Dr. Mara [phonetic]," (R. at 52), who had treated his

-19-

hypertension, (id.).  The ALJ observed that she did not "have that record either apparently," (id.), and stated that "[w]e need to get those records as well," id.  At the conclusion of the hearing, the ALJ repeated that the record would be left open for two weeks in order for Plaintiff's attorney to supplement it with the missing documents.[5]  (R. at 50, 62)

On July 25, 2003, Plaintiff's attorney sent the ALJ a letter, enclosing "all of the medical records provided to me by the VA Medical Center," (R. at 23), as well as "medical records received from Dr. Omer Meer and Dr. Steven Frank," (id.).  These documents were made part of the administrative record.  (R. at 160-65, 166-202, 203-08)

---

[5] The record reflects the follow colloquy between the ALJ and Plaintiff's counsel regarding supplementation of the record:

| | |
|---|---|
| ATTY: | And you would like for me to get those VA records and -- |
| ALJ: | Yes. |
| ATTY: | -- the, I think the internist -- |
| [ALJ]: | The internist, yes. |
| ATTY: | -- I'll follow up on getting those too. |
| .... | |
| ATTY: | I'll do my best with the VA.  I have not had a very good experience with them in getting medical records. |
| .... | |
| ALJ: | Oh, I'll give you two weeks.  If you have any problem let us know and we'll exten[d] it, but I like to keep the cases moving. |
| ATTY: | I'll stay in touch. |

(R. at 62)

The foregoing demonstrates that the ALJ noted the gaps in
the record, brought them to the attention of Plaintiff's counsel,
and instructed counsel to supplement the record.  Thus, the ALJ
fulfilled her duty, and it was Plaintiff's responsibility to
obtain the requested records.  Cf. Hawkins v. Chater, 113 F.3d
1162, 1167 (10th Cir. 1997)("[W]hen the claimant is represented
by counsel at the administrative hearing, the ALJ should
ordinarily be entitled to rely on the claimant's counsel to
structure and present claimant's case in a way that the
claimant's claims are adequately explored."); Sears v. Bowen, 840
F.2d 394, 402 (7th Cir. 1988)("[A]n ALJ is entitled to presume
that a claimant represented by counsel in the administrative
hearings has made his best case.").

Moreover, when a claim is made that an ALJ shirked his or
her duty to properly develop the record, a reviewing court "must
determine whether the [alleged] incomplete record reveals
evidentiary gaps which result in prejudice to the plaintiff."
Mandziej v. Chater, 944 F. Supp. 121, 130 (D.N.H. 1996)
(alteration in original)(internal quotation marks omitted).  In
other words, Plaintiff "must show both that the ALJ failed to
discharge his duty to adequately develop the record and that she
was prejudiced as a result."  Hagemike v. Chater, No. 94-595-B,
1996 WL 211798, at *3 (D.N.H. Feb. 26, 1996); see also Nelson v.
Apfel, 131 F.3d 1228, 1235 (7th Cir. 1997)("Mere conjecture or
speculation that additional evidence might have been obtained in
the case is insufficient to warrant a remand.")(citations and
internal quotation marks omitted); Shannon v. Chater, 54 F.3d
484, 488 (8th Cir. 1995)("[R]eversal due to [an ALJ's] failure to
develop the record is only warranted where such failure is unfair
or prejudicial.").  Plaintiff "must demonstrate what the ALJ
would have learned from an adequate inquiry and what difference

that would have made in the outcome." <u>Hagemike v. Chater</u>, 1996 WL 211798, at *3.

In the instant case, Plaintiff merely states that his medical records are not complete and, thus, the ALJ could not fully review his claim. <u>See</u> Plaintiff's Response. As previously noted, <u>see</u> Discussion section VI. A. <u>supra</u> at 17-18, Plaintiff has not indicated which medical records he believes were omitted, nor has he indicated how he was prejudiced by the allegedly incomplete record. Nothing in his submission to this Court provides any insight into what those records would have revealed. Thus, even if the ALJ's development of the record were deficient (and the Court has found that it was not), Plaintiff has failed to show that he suffered any prejudice as a result. Plaintiff's first claim of error is therefore rejected.

**B.   Reliance on Medical Expert**

Plaintiff's next argument is that the ALJ "accepted testimony from experts she chose to participate at the hearing," Plaintiff's Response, including testimony from the medical expert, Dr. Henry K. Freedman, <u>id.</u> Plaintiff states that Dr. Freedman is "a board certified urologist who has no experience in orthopedic or neurological procedures ... which [apply to] my condition ...."[6] <u>Id.</u> Consequently, Plaintiff complains that Dr. Freedman gave testimony about medical conditions in which he has no expertise and that Dr. Freedman never examined him or asked to see Plaintiff's MRI reports. <u>See id.</u>

According to 20 C.F.R. § 404.1529, at "the administrative law judge hearing or Appeals Council level, the administrative law judge or the Appeals Council may ask for and consider the

---

[6] The record contains a document which identifies a Dr. Henry K. Freedman of 30 Trafalgar Drive, Plattsburgh, New York, as having a primary specialty in urology and being board certified in that field. (R. at 155)

opinion of a medical expert concerning whether your impairment(s) could reasonably be expected to produce your alleged symptoms." 20 C.F.R. § 404.1529(b) (2006); see also 20 C.F.R. § 404.1527(f)(2)(iii) (2006)("Administrative law judges may also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart."). Thus, it was within the ALJ's authority to consult a medical expert. To the extent Plaintiff claims that the fact that the medical expert was selected by the ALJ by itself constitutes error, such claim is rejected.

With regard to the issue of Dr. Freedman's qualifications, the Court finds that Plaintiff has waived this claim of error by failing to raise it at or before the administrative hearing. Dr. Freedman testified under oath that his speciality was orthopedics. (R. at 29) Shortly thereafter, the ALJ asked Plaintiff's counsel if he had any questions about the doctor's qualifications, and Plaintiff's counsel responded negatively.[7] (R. at 30) In addition, Plaintiff and his counsel were notified that they could review Plaintiff's file prior to the hearing if they wished to do so. (R. at 158) Plaintiff's counsel stated at the outset of the hearing that he had done so. (R. at 28) At the time Plaintiff's counsel reviewed the file it included the

---

[7] The record reflects the following exchange between the ALJ and Plaintiff's counsel on this point:

ALJ:    Any questions about the expert's qualifications?

ATTY:   No.

(R. at 30)

document which identified Dr. Freedman's specialty as urology.[8]
(R. at 28)  Thus, Plaintiff cannot now challenge the
qualifications of the medical expert based on information which
was available to Plaintiff and his counsel at the time of the
hearing where his counsel was given the opportunity to question
the expert regarding his qualifications but declined to do so.
See Mills v. Apfel, 244 F.3d 1, 8 (1st Cir. 2001)(finding
plaintiff waived claim that ALJ erred where plaintiff did not
raise the issue before ALJ); see also Latulippe v. Comm'r, SSA,
No. 95-82-SD, 1996 WL 360363, at *8 (D.N.H. Mar. 7, 1996)
("Plaintiff provides no reason or excuse for his failure to bring
the matter to the attention of the court sooner.").

     In Mills v. Apfel, the United States Court of Appeals for
the First Circuit noted that a no-waiver approach at the ALJ
level to issues like the instant one "could cause havoc, severely
undermining the administrative process."  244 F.3d at 8.  The
court explained:

       If the ALJ had heard the objection now made and agreed
       with it, he could easily have considered and expressly
       found that there were other jobs in the economy available
       to [the plaintiff].  Here, the ALJ stopped at step four
       of the five-step process when he found that [the
       plaintiff] could return to her old jobs;  but if the
       prior jobs had been removed from the picture he would
       have proceeded to step five to consider whether there
       were other jobs in the economy available to her.

Id.  The above rationale applies here with equal force.  Had the
issue now being raised by Plaintiff been brought to the ALJ's
attention at the time, she could have addressed it by further
questioning the ME about his qualifications as an orthopedist.

_____

     [8] The Court reaches this conclusion based on the fact that at the
beginning of the hearing the ALJ identified the documents in the file,
(R. at 28), and they included the document which identified Dr.
Freedman's specialty, (R. at 3, 155).

Plaintiff's failure to do so warrants a finding of waiver.  For
that reason, the Court rejects Plaintiff's challenge to the ME's
qualifications.

As for Plaintiff's contention that Dr. Freedman never
examined him or asked to see Plaintiff's MRI reports, <u>see</u>
Plaintiff's Response, it appears that Plaintiff misunderstands
the role of the ME.  The ME is directed to review the record and
give testimony, not to examine a claimant, as reflected in the
ALJ's letter to Dr. Freedman prior to the hearing.  (R. at
153)(Letter from ALJ to Dr. Freedman of 6/3/03)(enclosing a copy
of the medical exhibits for the ME's review and stating that "IF
YOU HAVE EVER EXAMINED THE CLAIMANT, PLEASE TELEPHONE ME
IMMEDIATELY."); <u>see also</u> (R. at 29).[9]  Moreover, the ME testified
that he had reviewed the record, (R. at 30), and specifically
referred to MRIs from 1993 and 1998, (R. at 31).

Based on the foregoing, the Court finds that the ALJ's
reliance on the ME was justified.  Accordingly, the Court
rejects Plaintiff's second claim of error.

**C.    Reliance on Vocational Expert**

Plaintiff's final claim of error is that the VE "testified
under cross examination by my attorney that I cannot perform any
duties if I had to take frequent periods of lay down rests.  But
the Administrative Law Judge relied on his opinion as somewhat
negative to my status."  Plaintiff's Response.

---

[9] At the July 16, 2003, hearing, the ALJ asked the ME if he had
ever treated Plaintiff, to which the ME responded in the negative:

Q    Have you ever treated the Claimant?

A    I have not, Your Honor.

(R. at 30)

The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to "perform the exertional demands of light work, or work which requires maximum lifting of twenty pounds and frequent lifting of ten pounds ...." (R. at 19)  At the hearing, in response to a hypothetical question posed by the ALJ, the VE identified several jobs which existed in the regional economy for a person with Plaintiff's RFC. (R. at 60-61)  When given the opportunity to cross examine the VE, Plaintiff's counsel asked:

> Q   Would those jobs be available in this case if you included in the hypothetical that was just asked of you the restriction including Mr. Oliveira's need to lay down periodically during the day?
>
> A   No, they would[n't].[10]

(R. at 61)  Thus, Plaintiff presumably contends that the ALJ should have accepted Plaintiff's testimony that he needed to lay down periodically during the day, (R. at 35-36, 45), and that based on the above-quoted testimony of the VE a finding of disabled should have resulted.

The ALJ found that Plaintiff's

> statements concerning his impairment and its impact on his ability to work are not entirely credible in light of the degree of medical treatment required, the failure of [Plaintiff] to follow prescribed treatment, and the failure of the claimant to seek free or low-cost treatment from the Department of Veterans Affairs (VA). [Plaintiff] has had no treatment for his back problem since 1998.  His only medication is over-the-counter Tylenol.  He refused to have epidural steroid injections as was recommended by Dr. Greenblatt [R. at 115].  He also never went for physical therapy as was recommended

---

[10] Although the transcript reflects that the VE answered "No, they would," (R. at 61), it is clear from the surrounding context that the third word of the response was either actually or intended to be in the negative, (R. at 61-62).

by the orthopedic clinic physician at Memorial Hospital
[R. at 116-17, 120-25].

(R. at 18)

In further explanation for her finding that Plaintiff's
testimony was not entirely credible, the ALJ noted that:

> The [Plaintiff] testified to having been treated for
> medical problems at the VA Medical Center, but has [had]
> little treatment for his back there, despite its
> convenience and low cost. Moreover, records from the VA
> Medical Center from January 6, 1998[,] through March 1,
> 1998, make only one mention of a back problem, and
> indicate Mr. Oliveira had no ongoing treatment there for
> his back [R. at 160-65]. Dr. Greenblatt stated on July
> 10, 1998, that the claimant was not interested in
> treatment and he was simply being examined in order to
> file for a Veteran's pension [R. at 115]. In addition,
> treating physician records from Dr. Meer for the past two
> years make only the mention of chronic back pain and
> reduced range of motion, but indicate no active treatment
> was given[] until June 3, 2003, shortly before the
> hearing. On that date, Dr. Meer indicates that he was
> referring the claimant to another physician for back pain
> [R. at 208].

(R. at 18-19)

"In weighing the evidence and evaluating the claimant's
credibility, the ALJ is entitled to consider the consistency and
inherent probability of the testimony. Where there are
inconsistencies in the record, the ALJ may discount subjective
complaints ...." Frustaglia v. Sec'y of Health & Human Servs.,
829 F.2d 192, 195 n.1 (1st Cir. 1987)(citations and internal
quotation marks omitted); see also id. at 195 ("The credibility
determination by the ALJ, who observed the claimant, evaluated
his demeanor, and considered how that testimony fit in with the
rest of the evidence, is entitled to deference, especially when
supported by specific findings."). The court may take into
consideration a claimant's failure to treat or seek treatment for
his subjective complaints. See Irlanda Ortiz v. Sec'y of Health

-27-

& Human Servs., 955 F.2d 765, 770 (1st Cir. 1991).  Thus,
although Plaintiff testified that he needed to lay down daily for
one or two hours, depending on whether he fell asleep, (R. at
45), the ALJ was not required to accept this testimony.

The reasons given by the ALJ for discounting Plaintiff's
testimony are supported by the record.  As noted by the ALJ, (R.
at 18), there are long periods of time during which Plaintiff did
not seek treatment for his back pain.  Plaintiff testified at the
hearing that the last time he had seen any doctor was in January
of 1999, (R. at 42), which was more than four years before the
administrative hearing took place in July of 2003, (R. at 25).
Plaintiff also admitted that he had not been treated for his back
pain at the VA even though he had been seen there for diabetes
and high blood pressure and treatment at the center was
relatively inexpensive.  (R. at 42-43)   Even on a cold record,
Plaintiff's explanation for not doing so, namely that he would be
"there all day and I don't know.  I don't think they're adequate
doctors," (R. at 43), is less than persuasive.

Plaintiff's failure to follow his doctors' instructions
regarding treatment is a recurrent theme in the medical reports.
He rejected on July 10, 1998, Dr. Greenblatt's suggestions of
caudal epidural steroids or surgery, and Dr. Greenblatt concluded
that Plaintiff "was not really interested in any treatment."  (R.
at 115)  Dr. Greenblatt's impression was that one of Plaintiff's
main reasons for coming to see him was that Plaintiff was
applying for some kind of Veterans Disability pension.  (Id.)
Plaintiff was repeatedly referred to physical therapy by
Memorial Hospital but failed to follow through, (R. at 116-17,
120-25), even though the record suggests that special efforts
were made to get Plaintiff into physical therapy in the form of a
telephone call from the examining physician, (R. at 116), and an
attempt by physical therapy to contact Plaintiff, (R. at 123).

-28-

Plaintiff's explanation that he did not attempt physical therapy because Dr. Greenblatt allegedly told him it would not help, (R. at 124), is not supported by anything in the record and is at odds with the referrals to physical therapy made by his treating physician, Dr. Bernstein, in November of 1995, (R. at 101), and March of 1996, (R. at 103).  In fact, Dr. Bernstein repeatedly stressed to Plaintiff the need for physical therapy.  (R. at 102)

The record reflects other instances where Plaintiff appears not to have been fully compliant with his doctors' instructions. On May 26, 1993, Dr. Bernstein wrote: "We have recommended to this patient that he pursue an[] exercise program on a daily basis, pursue swimming[,] and increase his walking.  We would anticipate progressive improvement."  (R. at 90)  Four months later, on September 23, 1993, Dr. Bernstein again recorded: "We have recommended to the patient that he pursue a progressive exercise program at his local YMCA, Boys' Club or other facility near his place of residence."  (R. at 92)  Again, on February 8, 1994, Dr. Bernstein noted: "We have discussed at length with the patient the exercise program that is necessary for him.  This he should do on a regular basis noting that his significant restriction in range of motion in the lumbar region persists." (R. at 95)  Dr. Bernstein further stressed the importance of exercise to Plaintiff on April 5, 1994, (R. at 96), October 18, 1994, (R. at 99), June 21, 1996, (R. at 105), September 13, 1996, (R. at 106), and November 15, 1996, (R. at 107).  It can reasonably be inferred from these notes, particularly those reflecting lengthy, (R. at 95), or repeated, (R. at 99, 106), discussions about the importance of physical exercise, that Plaintiff was not complying with these instructions to the degree Dr. Bernstein desired.  Indeed, a July 10, 1997, office note reflects that Plaintiff "is not exercising very much," (R. at 110), and that his weight has increased to 250 pounds, (id.).

An April 1, 1999, treatment note from the Rehoboth-Seekonk Medical Center reflects that Plaintiff had been seen at the VA for his high blood pressure and diabetes but that he was "noncompliant." (R. at 190)  The note also indicates that Plaintiff had stopped taking his diabetes medication, (R. at 189), and that this needed to be addressed, (R. at 190).

In sum, the reasons given by the ALJ for not fully accepting Plaintiff's testimony regarding his physical limitations and capabilities are supported by substantial evidence in the record. The Court finds no error in the fact that the ALJ did not accept Plaintiff's contention that he needed to lay down periodically during the day.  See Becker v. Sec'y of Health & Human Servs., 895 F.2d 34, 36-37 (1st Cir. 1990)("Weight is given the administrative law judge's determinations of credibility for the obvious reason that he or she sees the witnesses and hears them testify while the ... reviewing court look[s] only at [the] cold record[].")(alterations in original)(internal quotation marks omitted).  To the extent that Plaintiff argues to the contrary, such argument is rejected.

## VII. Errors Not Claimed

In addition to considering the specific errors identified by Plaintiff, the Court has reviewed the entire record in this matter.  The Court finds that the ALJ's findings are supported by substantial evidence and that they are legally correct. Accordingly, the decision of the ALJ should be affirmed.

## VIII. Conclusion

For the reasons discussed above, I recommend that Defendant's Motion to Affirm be granted.  I further recommend that the District Court enter Final Judgment in favor of Defendant.

Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten

(10) days of its receipt.  <u>See</u> Fed. R. Civ. P. 72(b); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision.  <u>See</u> <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).

DAVID L. MARTIN
United States Magistrate Judge
June 23, 2006